Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joshua D. Smith, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                                 Plaintiffs,

        -against-

UNITED PHARMACY NYC INC., IRINA ALISHAYEVA,
GAETAN JEAN-MARIE, N.P., SHAI BIKEL, N.P., and
JOHN DOE DEFENDANTS "1" THROUGH "10,"

                                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.: _____( )

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants United Pharmacy NYC Inc. ("United

Pharmacy"), Irina Alishayeva ("Alishayeva"), Gaetan Jean-Marie, N.P. ("NP Jean-Marie"), Shai

Bikel, N.P. ("NP Bikel"), and John Doe Nos. "1" through "10" (the "John Doe Defendants")

1

(collectively, the "Defendants"), hereby allege as follows:

1. GEICO brings this action to terminate an ongoing fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $4 million in fraudulent pharmaceutical claims. The Defendants' scheme targeted expensive topical prescription drug products and an exorbitantly priced combination delayed release oral medication, which they systematically dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO ("Insureds") without regard to genuine patient care. As part of the fraudulent scheme and to maximize their profits, the Defendants engaged in unlawful, collusive arrangements to steer large volumes of medically unnecessary prescriptions to United Pharmacy.

2. United Pharmacy purports to be a neighborhood pharmacy operating in Queens, New York, but in fact, has been used by Alishayeva, along with the John Doe Defendants, as part of a large scale fraud scheme to exploit patients for financial gain by overwhelmingly targeting Lidocaine 5% Ointment, Diclofenac Sodium 2% Solution, Diclofenac Sodium Gel 3%, and Naproxen-Esomeprazole tablets, along with certain other prescription drug medications (collectively, the "Fraudulent Pharmaceuticals"). The fraudulent scheme began in 2023 when Alishayeva partnered with individuals regularly involved in No-Fault insurance fraud who could arrange for and facilitate collusive referral arrangements and ensure the steering of voluminous prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy.

3. In furtherance of the scheme, Alishayeva and United Pharmacy ("the "Pharmacy Defendants") along with the John Doe Defendants engaged in unlawful, collusive referral arrangements with NP Jean-Marie and NP Bikel (collectively, the "Prescribing Provider Defendants"), various other prescribing licensed healthcare providers (together with the

2

Prescribing Provider Defendants, the "Prescribers"), and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"), in order to have large volumes of prescriptions – or purported prescriptions – for the Fraudulent Pharmaceuticals directed to United Pharmacy.

4.      Pursuant to the collusive referral arrangements with the Prescribers and Clinic Controllers, the Pharmacy Defendants submitted an enormous volume of fraudulent billing under the name of United Pharmacy for the targeted Lidocaine 5% Ointment (the "Fraudulent Topical Lidocaine"), Diclofenac Sodium 2% Solution and Diclofenac Sodium Gel 3% (together, the "Fraudulent Topical Diclofenac") (collectively, the "Fraudulent Topical Pain Products") and Naproxen-Esomeprazole tablets (the "Fraudulent Naproxen-Esomeprazole"). The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole to dispense to Insureds in place of other effective but much-less costly prescription and non-prescription drug products. In fact, approximately 84% of the billing submitted through United Pharmacy was for the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole, with charges typically ranging from $1,887.13 to $2,358.92 per single prescription of Diclofenac Sodium Gel 3%; $2,686.36 or $2,636.38 per single prescription of Diclofenac Sodium 2% Solution; $1,218.97 to $1,904.65 per single prescription of Fraudulent Topical Lidocaine; and $2,680.78 per single prescription of Fraudulent Naproxen-Esomeprazole.

5.      By this action, GEICO seeks to recover approximately $2.3 million that the Defendants wrongfully obtained from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to United Pharmacy of approximately $1.4 million in pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Pharmacy Defendants

3

submitted or caused to be submitted through United Pharmacy because:

    i.    Pharmacy Defendants billed GEICO for Fraudulent Pharmaceuticals that were medically unnecessary and which were prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive financial arrangements designed to exploit the patients for financial gain, without regard for genuine patient care;

    ii.    Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and had United Pharmacy dispense in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals in order to exploit the reimbursement rates set forth by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule") and inflate the charges to GEICO;

    iii.    Pharmacy Defendants participated in unlawful, collusive financial arrangements in which they steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy; and

    iv.    Pharmacy Defendants submitted charges for the Fraudulent Pharmaceuticals through United Pharmacy pursuant to illegal, invalid and unauthorized prescriptions issued as a result of decisions made by laypersons.

6.    The Defendants' scheme began in 2023 and continues uninterrupted to the present day as the Defendants continue to submit, or cause to be submitted, fraudulent claims to GEICO. Additionally, the Pharmacy Defendants continue to pursue collection on United Pharmacy's unpaid fraudulent claims against GEICO, as well as other New York automobile insurers.

7.    As discussed more fully below, Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to a fraudulent insurance scheme that that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e., the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Pharmaceuticals that were not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive referral arrangements; (ii)

4

the Pharmacy Defendants exploited the Pharmacy Fee Schedule by intentionally targeting a specific set of pharmaceutical products that they acquired at low cost and caused United Pharmacy to dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less-costly pharmaceuticals; (iii) the Pharmacy Defendants participated in unlawful, collusive referral arrangements in which they steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy; and (iv) the Pharmacy Defendants submitted or caused to be submitted claims for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and unauthorized prescriptions issued as a result of decisions by laypersons.

8.      Based on the foregoing, the Pharmacy Defendants do not have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date which the Pharmacy Defendants submitted, or caused to be submitted, to GEICO through United Pharmacy using the United States mail or through interstate wires seeking reimbursement under New York's No-Fault law.

9.      As a result of the Defendants' scheme, GEICO has incurred damages of approximately $2.3 million.  The Pharmacy Defendants also continue to seek to collect further on the fraudulent claims.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized

5

to conduct business and to issue automobile insurance policies in New York.

## II.      Defendants

11.      Defendant United Pharmacy is a New York corporation, formed on or about November 2, 2022, with its principal place of business at 135-34 Rockaway Blvd, South Ozone Park, New York ("135-34 Rockaway Blvd"). United Pharmacy was first registered with the New York State Department of Education, Office of Professions on February 27, 2023.

12.      Defendant Alishayeva resides in, is a citizen of, and is domiciled in New York and is the purported owner of United Pharmacy.

13.      Alishayeva is married to Eduard Bangiyev ("E. Bangiyev"), who is employed by the Bangiyev Law Firm PLLC (the "Bangiyev Firm"), which submits bills to GEICO on behalf of United Pharmacy. E. Bangiyev pled guilty after being indicted for conspiracy to defraud the United States in connection with the manufacturing and sale of counterfeit United States currency. See USA v. Loz et al., 1:14-cr-206 (E.D. Va. 2014). E. Bangiyev's relatives include Anna Bangiyev, owner of the Bangiyev Firm, and Ilana Bangiyev, United Pharmacy's landlord.

14.      Defendant NP Jean-Marie resides in, is a citizen of, and is domiciled in New York. NP Jean-Marie is a Prescriber who owns South Shore Family Health NP, P.C. ("South Shore") and knowingly issued prescriptions, or purported prescriptions, for the Fraudulent Pharmaceuticals without regard for genuine patient care through South Shore, which were directed to United Pharmacy.

15.      Defendant NP Bikel resides in, is a citizen of, and is domiciled in New York. NP Bikel is a Prescriber who, while working for South Shore, knowingly issued prescriptions, or purported prescriptions, for the Fraudulent Pharmaceuticals without regard for genuine patient care, which were directed to United Pharmacy.

16.     The John Doe Defendants are individuals and entities, presently not identifiable, who, along with the Defendants, participated in the fraudulent scheme perpetrated against GEICO by, among other things, participating in the operation and control of United Pharmacy, facilitating the collusive arrangements with the Prescribers and Clinic Controllers, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care, and who, upon information and belief, reside in, are citizens of, and are domiciled in New York.

<strong>JURISDICTION AND VENUE</strong>

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

18.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

19.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

<strong>ALLEGATIONS COMMON TO ALL CLAIMS</strong>

**I.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

21.     GEICO underwrites automobile insurance in the State of New York.

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 165 et seq.) (collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

24.     The No-Fault Laws limit reimbursement for pharmacy benefits to prescription drugs only.  Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

25.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

26.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

27.     The implementing regulation adopted by the Superintendent of Insurance, 11

NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

28.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

29.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

30.    Pharmacies "may be held liable for medically unnecessary services" submitted to No-Fault insurers similar to other "downstream providers." See Gov't Emples. Ins. Co. v. Advanced Comp. Lab., L.L.C., 2020 WL 7042648 (E.D.N.Y. 12/1/2020); 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. 12/1/2020); Gov't Emples. Ins. Co. v. Wellmart RX, Inc., 435 F. Supp. 3d 443 (E.D.N.Y. 2020). See also Long Is. Radiology v. Allstate Ins. Co., 36 A.D.3d 763, 764 (2d Dept. 2007).

## II.    Pertinent Statutes and Regulations Relating to Pharmacies

32.    Pursuant to New York Education Law § 6808, no person, firm, corporation, or

association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

33.    Pursuant to New York Public Health Law §238-a(1)(a), a practitioner authorized to order or prescribe, among other things, pharmacy services may not make a referral for such services to a healthcare provider authorized to provide such services, including a pharmacy, where such practitioner (or immediate family member of such practitioner) has a financial relationship with the healthcare provider/pharmacy.

34.    Pursuant to New York Public Health Law §238-a(1)(b) and §238-a (7), a healthcare provider, like a pharmacy, shall not present to an insurer a bill or demand for payment for pharmacy services furnished in violation of §238-a(1)(a) and the healthcare provider and referring practitioner are jointly and severally liable to the insurer for any amounts collected.

35.    Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party" and are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

36.    New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for financial gain of the licensee or of a third party.

38.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

39.    New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

40.    Pursuant to New York Law § 68082(2)(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

41.    Pursuant to 8 N.Y.C.R.R. § 63.6(b)(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with OTC drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

42.    Pursuant to New York Education Law § 6808(2)(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

43.    Pursuant to New York Education Law § 6808(2)(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

11

**III.    The Defendants' Scheme Involving the Fraudulent Pharmaceuticals**

**A.       Overview of the Scheme**

44.    Beginning in 2023, and continuing through the present day, the Defendants implemented a fraudulent scheme in which they used United Pharmacy to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges for the Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

45.    United Pharmacy purports to be a storefront neighborhood pharmacy operating in and catering to the local community in Queens, New York, when in fact, the Defendants used United Pharmacy as part of a large-scale No-Fault fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals in a predetermined, protocol fashion to Insureds who had no medical need for the pharmaceuticals prescribed.

46.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, United Pharmacy's business targeted a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole), which made up the overwhelming majority of claims submitted to GEICO. Specifically, the Pharmacy Defendants have submitted – to GEICO alone – over $3.1 million in claims for reimbursement for the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole, which account for approximately 84% of the billing submitted through United Pharmacy.

47.    The Pharmacy Defendants selected these products – Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%, Diclofenac Sodium 2% Solution, and the Fraudulent Naproxen-Esomeprazole – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the

12

Pharmacy Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws, thus leading the Pharmacy Defendants to target the prescription of the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole, despite the fact that these products were not medically necessary for the Insureds who received them.

48.    Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that Lidocaine and Diclofenac have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

49.    The remaining billing submitted through United Pharmacy was primarily for oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers submitted as part of the scheme to defraud GEICO.

50.    Alishayeva is the record owner of United Pharmacy and responsible for the proper conduct of United Pharmacy under the law. Alishayeva, together with the John Doe Defendants, operated United Pharmacy for the sole purpose of effectuating a multimillion-dollar pharmacy fraud scheme.

51.    Alishayeva did not market or advertise United Pharmacy to the general public or make any other legitimate efforts to attract patients who might need pharmaceuticals or healthcare practitioners who might legitimately prescribe these pharmaceuticals.  Similarly, Alishayeva did virtually nothing that would be expected of the owner of a legitimate pharmacy to develop its reputation in the medical community or to attract patients who might need pharmaceuticals or healthcare practitioners who might legitimately prescribe these pharmaceuticals.

52.     Instead, as part of the fraudulent scheme, the Pharmacy Defendants engaged in unlawful, collusive financial arrangements with the Prescribers and Clinic Controllers, paying them kickbacks and/or providing other financial incentives, without the knowledge of the Insureds, so that large volumes of prescriptions – including forged and unauthorized prescriptions – for the Fraudulent Pharmaceuticals would be steered to United Pharmacy as quickly as possible.

53.     The collusive financial arrangements among the Pharmacy Defendants and the Prescribers and Clinic Controllers are the very kind of collusive relationships that are prohibited by New York Public Health Law §238-a, which expressly prohibits referrals for pharmacy services where the referring practitioner has a financial relationship with the pharmacy. Indeed, Public Health Law §238-a(1)(b) and §238-a (7) prohibit a pharmacy from billing for pharmacy services furnished in violation of §238-a(1)(a) and render both the healthcare provider and referring practitioner jointly and severally liable to the insurer for any amounts collected.

54.     In keeping with the fact that Alishayeva, along with the John Doe Defendants, operated the pharmacy for the sole purpose of effectuating a fraudulent scheme, and received large volumes of prescriptions for the Fraudulent Pharmaceuticals pursuant to unlawful, collusive referral arrangements with the Prescribers and Clinic Controllers, United Pharmacy purported to dispense more than $196,000.00 of Fraudulent Pharmaceuticals to GEICO Insureds in the first three months following the onset of its billing relating to GEICO. Upon information and belief, United Pharmacy purported to dispense hundreds of thousands of dollars of additional Fraudulent Pharmaceuticals to insureds associated with other New York automobile insurers during the same three-month time frame, "ramping up" its dispensing and billing for Fraudulent Pharmaceuticals associated with patients at the No-Fault Clinics as quickly as possible without any legitimate business explanation.

55.    Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the clinics, and dictate the predetermined fraudulent treatment protocols that are used to maximize profits without regard to actual patient care. These predetermined fraudulent protocols almost always involve the rendering and prescribing of excessive medically unnecessary healthcare goods and/or services and unlawful referral and/or prescription practices.

56.    As part of the collusive financial arrangements described herein, and in exchange for a steady stream of prescriptions that they could submit in support of United Pharmacy's fraudulent billing, Alishayeva issued checks through United Pharmacy that were deposited into various bank accounts held by an individual by the name of Mikhail Kushmakov ("Kushmakov"). Kushmakov, through various entities he owns, is the primary operator/leaseholder of various No-Fault Clinics. In this capacity, Kushmakov effectuates control over the clinics and their respective patient populations. As part of the fraudulent scheme to steer prescriptions to United Pharmacy regardless of medical necessity, GEICO has identified payments from United Pharmacy into bank accounts held by Kushmakov totaling approximately $44,000.00 to date.

57.    Further illustrative of the fact that the prescriptions were the byproducts of unlawful, collusive arrangements and fraudulent treatment protocols, nearly 65% of the prescriptions steered to United Pharmacy originated from only five healthcare providers, all of whom are either nurse practitioners or physician assistants, including primarily NP Jean-Marie and NP Bikel, along with Nick Nicoloff, P.A., Jamie Arnau P.A. and Igor Zilberman N.P.

58.    In many instances the prescriptions were not actually authorized by a licensed prescriber, but instead were "created" by the Clinic Controllers using the credentials of the Prescribers.  Indeed, in several instances, United Pharmacy billed for Fraudulent Pharmaceuticals

15

dispensed to an Insured based on a prescription from a Prescriber who did not appear to examine the Insured on the date of the prescription, if at all.

59.    For example, United Pharmacy filled electronic prescriptions purportedly ordered by Nick Nicoloff, P.A. ("PA Nicoloff"), which were not authorized by him. In fact, the prescriptions used PA Nicoloff's name but virtually always incorrectly identified him as a medical doctor -- "nick nicoloff (MD)" -- and failed to identify any supervising physician as required by New York law when a physician assistant issues a prescription. See 10 N.Y.C.R.R. §94.2(e)(3).

60.    Furthermore, the prescriptions using PA Nicoloff's name were typically issued on a date when there is no evidence that the patient was actually treated by PA Nicoloff. For example:

    i.    Insured AM was allegedly involved in a motor vehicle accident on August 12, 2023. On September 26, 2023, PA Nicoloff purportedly issued electronic prescriptions to AM for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Celebrex, and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On November 1, 2023, PA Nicoloff purportedly issued electronic prescriptions to AM for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Celebrex, Cyclobenzaprine, and Omeprazole, which were dispensed and billed for by United Pharmacy. On December 6, 2023, PA Nicoloff purportedly issued electronic prescriptions to AM for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Celebrex, and Omeprazole, which were dispensed and billed for by United Pharmacy. There is no evidence that AM was treated by PA Nicoloff at any time between August 12, 2023 and December 6, 2023.

    ii.    Insured VW was allegedly involved in a motor vehicle accident on October 24, 2023. On November 28, 2023, PA Nicoloff purportedly issued electronic prescriptions to VW for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Celebrex, Cyclobenzaprine, and Omeprazole, which were dispensed and billed for by United Pharmacy. There is no evidence that VW was treated by PA Nicoloff on November 28, 2023.

    iii.    Insured MR was allegedly involved in a motor vehicle accident on February 14, 2024. On March 6, 2024, PA Nicoloff purportedly issued electronic prescriptions to MR for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Celebrex, Cyclobenzaprine, and Omeprazole, which were dispensed and billed for by United Pharmacy. On March 20, 2024, PA Nicoloff purportedly issued electronic prescriptions to MR for Fraudulent Topical Lidocaine, Cyclobenzaprine, and Celecoxib, which were dispensed and billed for by United Pharmacy. There is no evidence that MR was treated by PA Nicoloff at

16

any time between February 14, 2024 and March 20, 2024.

iv.   Insured LL was allegedly involved in a motor vehicle accident on October 9, 2023. On November 28, 2023, PA Nicoloff purportedly issued electronic prescriptions to LL for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Celebrex, Cyclobenzaprine, and Omeprazole, which were dispensed and billed for by United Pharmacy. There is no evidence that LL was treated by PA Nicoloff at any time between October 9, 2023 and November 28, 2023.

v.   Insured RG was allegedly involved in a motor vehicle accident on January 5, 2024. On January 17, 2024, RG sought treatment with PA Nicoloff of Home PA Services at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York (the "Avenue V Clinic"). On January 16, 2024, *one day prior to PA Nicoloff's initial examination of RG,* PA Nicoloff purportedly issued prescriptions for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, and Naproxen, which were dispensed and billed for by United Pharmacy.

vi.   Insured MG was allegedly involved in a motor vehicle accident on June 5, 2023. On July 5, 2023, PA Nicoloff purportedly issued electronic prescriptions to LL for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Celebrex, Cyclobenzaprine, and Omeprazole, which were dispensed and billed for by United Pharmacy. On September 12, 2023, PA Nicoloff purportedly issued electronic prescriptions to MG for Fraudulent Topical Lidocaine, Diclofenac Sodium Gel 3%, Naproxen, and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. There is no evidence that MG was treated by PA Nicoloff on July 5, 2023 or September 12, 2023.

61.   Many of the prescriptions purportedly ordered by PA Nicoloff also listed his address as "5th ave4th [sic] floor, new york [sic], NY 10017", which is an incomplete and likely phony address having nothing to do with PA Nicoloff. Alternatively, other prescriptions allegedly issued by PA Nicoloff listed his address as "2119 East 15th Street, Suite B1, New York, NY 11229," which is not a medical office, but a "virtual" office/business mailing address associated with PA Nicoloff and with multiple durable medical equipment supply companies.

62.   Not surprisingly, PA Nicoloff recently stated under oath that, among other things, three No-Fault Clinics located in Brooklyn, New York fabricated documents using his name and signature, along with his NYS license number, NPI number, DEA number, tax identification number, social security number, and professional stamp.

17

63.    The other Prescribers and No-Fault Clinics that were the main source of the prescriptions that were steered to United Pharmacy have been the subject of investigations and lawsuits with regard to their fraudulent billing and treatment practices.

64.    NP Jean-Marie and South Shore were previously sued by Liberty Mutual Insurance Company for their involvement in a fraudulent scheme in which it was alleged, among other things, (i) South Shore was owned and controlled by laypersons; and (ii) they submitted claims for services that were not medically necessary and were provided pursuant to a fraudulent predetermined treatment protocol. See Liberty Mut. Ins. Co. et al. v. New Arena PT PC et al., 1:24-cv-01646(DG)(JRC) (E.D.N.Y. 2024). NP Bikel, though not personally sued by Liberty Mutual, worked with NP Jean-Marie at South Shore

65.    Jamie Arnau P.A. ("PA Arnau") is associated with Atlantic Medical & Diagnostic, P.C. ("Atlantic Medical"). Atlantic Medical, along with its record owner Jonathan Landow, M.D., have been sued by New York automobile insurers in connection with alleged No-Fault fraud schemes. See USAA v. Jonathan Landow, M.D. et al., 1:24-cv-03471 (NRM)(MMH) (E.D.N.Y. 2024); Allstate Ins. Co. v. Jonathan S. Landow, M.D. et al., 1:24-cv-02010 (DLI)(JRC) (E.D.N.Y. 2024); Gov't Emples. Ins. Co. et al. v. Landow, et al., 1:21-cv-01440 (NGG)(RER) (E.D.N.Y. 2021).

66.    Igor Zilberman N.P. ("NP Zilberman") was previously sued by Liberty Mutual Insurance Company for his involvement in a fraudulent scheme in which it was alleged that he issued prescriptions in exchange for kickbacks. See Liberty Mut. Ins. Co. et al. v. AVK Rx Inc. et al., 2:22-cv-07329(GRB)(SIL) (E.D.N.Y. 2022).

67.    The relationship between Alishayeva, the Prescribers, and the Clinic Controllers was integral to the Defendants' scheme because it established a "quid pro quo" – the Clinic

18

Controllers allowed the Prescribers to obtain access to patients at the No-Fault Clinics and, pursuant to predetermined protocols and unlawful referral arrangements, allowed them to bill No-fault insurers for services they purportedly provided, which in turn incentivized the illegitimate prescribing and steering of large volumes of prescriptions for specifically targeted Fraudulent Pharmaceuticals.

68.    The prescriptions for the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole, that were steered to United Pharmacy were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, and excessive healthcare services, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive referral arrangements.

69.    United Pharmacy submitted billing to GEICO based on prescriptions issued pursuant to predetermined fraudulent treatment and billing protocols, and illegal, collusive referral arrangements that prevented the Insureds using a pharmacy of their choice.

70.    In keeping with the fact that the Pharmacy Defendants steered the prescriptions to United Pharmacy without regard to patient choice, nearly 50% of the Insureds that allegedly received pharmaceuticals dispensed by United Pharmacy lived outside of Queens County, New York, where the pharmacy is located, with these Insureds' residences scattered throughout Brooklyn, the Bronx, Manhattan and Long Island, including Nassau and Suffolk County.

71.    In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by United Pharmacy lived in cities and counties outside of New York City, with some residences located outside of the State of New York, such as California, Connecticut, Florida, Nebraska, New Jersey, Ohio, South Carolina, and Virginia.

72.    The Pharmacy Defendants colluded with the Prescribers and Clinic Controllers to

19

ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy regardless of: (i) the distance of the pharmacy to the Insureds' residences or the Prescribers' practices; and (ii) the fact that there were countless other pharmacies located much closer to the Insureds' residences.

73.     But for the Pharmacy Defendants' unlawful, collusive referral agreements with the Prescribers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

74.     The Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy, irrespective of the pharmacy's inconvenient location to the Insureds' residences or the Prescribers' practices, because the prescriptions were being issued pursuant to illegal, collusive referral arrangements.

75.     The Pharmacy Defendants used the prescriptions, or purported prescriptions, obtained from the Prescribers and Clinic Controllers to bill GEICO and other insurers for the Fraudulent Pharmaceuticals.

76.     The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

77.     The Pharmacy Defendants, along with the John Doe Defendants, implemented their pharmaceutical fraud scheme involving the Prescribers and Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of unlawful, collusive referral agreements intended to inflate the billing from United Pharmacy to insurers and to financially enrich the Defendants; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical

products (i.e., the Fraudulent Topical Pain Products and the Fraudulent Naproxen-Esomeprazole) that they dispensed in large volumes to Insureds through United Pharmacy with exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost.

**B.      The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care**

78.     In basic terms, the goal of medical treatment is to help each patient get better in a timely manner and to provide an appropriate and medically necessary course of treatment for each patient's individual needs. Notwithstanding this basic goal, the Insureds treated by the Prescribers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from United Pharmacy – were virtually always subjected to a predetermined, medically unnecessary, and prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' medically appropriate and necessary treatment and timely return to good health.

79.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

80.    More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain. According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate. Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom these medications are clinically appropriate.

81.    Further, like the WHO and DHHS, the New York State Workers' Compensation Board's ("NYS WCB") published medical treatment guidelines state that oral, older generation NSAIDs are recommended as first-line medications for the treatment of neck and back pain, and that over-the-counter medications should be tried prior to prescription NSAIDs. See New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 36); New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 32).

82.    Prescriptions drugs should not be prescribed when there is no indication for use as every medication carries an inherent risk for adverse events. For example, proton pump inhibitors such as esomeprazole should only be prescribed to patients at high risk for NSAID-induced gastrointestinal bleeding. At-risk patients include elderly patients, diabetics, cigarette smokers, and those with a history of prior gastrointestinal bleeding. Also included in this high-risk group are

patients taking medications for other indications such as patients taking aspirin for cardiovascular protection following stroke or heart attack, or patients taking anticoagulants due to history of recurrent blood clots or atrial fibrillation.

83.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

84.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

85.     With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs have shown that they are no more effective than a placebo.

86.     Despite these guidelines and the basic goal underlying the practice of medicine to help patients recover in a timely fashion with a medically necessary course of treatment for each patient's individual clinical needs, the Insureds who received pharmaceuticals from United Pharmacy, and who were purportedly treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' receiving medically appropriate and necessary care and a timely return to good health.

87.     Pursuant to these predetermined protocols, the Prescribers produced generic,

preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that lacked any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products, without regard to potential adverse effects.

88. Indeed, the manner in which the Insureds were prescribed and dispensed the Fraudulent Pharmaceuticals reflects a protocol driven scheme with little to no relationship to the patients' clinical needs or patient history, deviates from the medical standards of care, and demonstrates a gross indifference to patient health and safety

89. For example, the initial examination reports prepared by the Prescribers virtually never stated any individualized medical need or basis for the prescriptions for the Fraudulent Pharmaceuticals.

90. The Prescribers often failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

91. The Prescribers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by United Pharmacy were actually used by the patient.

92. The Prescribers also failed to document in their follow-up examinations whether the Fraudulent Pharmaceuticals dispensed by United Pharmacy provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

93. At times, the Prescribers failed to document that the patient even received a Fraudulent Pharmaceutical.

24

94.    Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

95.    Notwithstanding the creation of their examination reports, the Prescribers' prescriptions for the Fraudulent Pharmaceuticals dispensed by United Pharmacy were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine medical needs of the patients.

96.    As an example, Clinic Controllers routinely caused patients treating at their respective No-Fault Clinics to be referred for medical evaluations with NP Jean-Marie, NP Bikel, or other employees of South Shore. NP Jean-Marie, NP Bikel, and the other employees of South Shore thereafter ceded to the dictates of the Clinic Controllers and exaggerated the extent of the patients' injuries, to the extent they were ever even injured at all, in order to fraudulently justify a multitude of other, voluminous, excessive and medically unnecessary healthcare services.

97.    For example, virtually every Insured who received an examination by NP Jean-Marie or NP Bikel of their lumbar spine, cervical spine, or shoulder had examination findings that were "copied and pasted" and further, to the extent their "Disability Status" was documented in a report, virtually every Insured's examination report falsely indicated the Insured was "100% totally disabled" without any further explanation or justification.

98.    As a result of the Insureds' phony initial examinations, NP Jean-Marie, NP Bikel, and/or other Prescribers employed by South Shore, often issued multiple rounds of prescriptions for Naproxen-Esomeprazole along with Cyclobenzaprine, as part of the fraudulent scheme. For example:

i.  Insured AD was purportedly involved in a motor vehicle accident on April 17, 2024. Thereafter, AD sought treatment with South Shore at a No-Fault Clinic located at 243-35 Merrick Blvd, Rosedale, NY (the "Merrick Boulevard Clinic"). On April 17, 2024, NP Bikel issued electronic prescriptions to AD for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On May 17, 2024, NP Jean Marie issued electronic prescriptions to AD for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On June 19, 2024, NP Bikel issued electronic prescriptions to AD for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

ii.  Insured WN was purportedly involved in a motor vehicle accident on February 23, 2024. Thereafter, WN sought treatment with South Shore at the Merrick Boulevard Clinic. On February 28, 2024, NP Bikel issued electronic prescriptions to WN for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On April 12, 2024, Judy Thomas NP ("NP Thomas") issued electronic prescriptions to WN for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On June 2, 2024, NP Jean Marie issued electronic prescriptions to WN for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

iii.  Insured BS was purportedly involved in a motor vehicle accident on December 13, 2023. Thereafter, BS sought treatment with South Shore at the Merrick Boulevard Clinic. On January 24, 2024, NP Bikel issued electronic prescriptions to BS for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On February 23, 2024, NP Jean-Marie issued electronic prescriptions to BS for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On April 17, 2024, NP Bikel issued electronic prescriptions to BS for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

iv.  Insured AP was purportedly involved in a motor vehicle accident on November 16, 2023. Thereafter, AP sought treatment with South Shore at the Merrick Boulevard Clinic. On November 29, 2023, NP Bikel issued electronic prescriptions to AP for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On January 25, 2024, NP Bikel issued electronic prescriptions to AP for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy. On March 4, 2024, NP Jean-Marie issued electronic prescriptions to AP for Esomeprazole-Naproxen and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

99.  The prescriptions authorized by NP Jean-Marie, NP Bikel and/or other Prescribers

26

employed by South Shore and filled by United Pharmacy resulted in approximately $570,000.00 in fraudulent claims to GEICO.

100. Moreover, in keeping with the fact that the Pharmacy Defendants targeted a specific set of exorbitantly priced pharmaceuticals that were not medically necessary and were prescribed and dispensed pursuant to predetermined treatment protocols and unlawful, collusive referral agreements, Insureds involved in the same motor vehicle accident were often subjected to nearly identical course of treatment and prescribed the same set of Fraudulent Pharmaceuticals, regardless of the Insured's individual circumstances or actual injuries, and without regard to genuine patient care

101. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

102. It is extremely improbable that multiple Insureds involved in the same automobile accident would routinely require the same pharmaceutical products.

103. Even so, pursuant to the fraudulent and collusive referral arrangements, and as demonstrated herein, the Prescribers prescribed, and United Pharmacy dispensed, the same set of Fraudulent Pharmaceuticals to Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care, as art of the fraudulent scheme. For example:

> i. On July 26, 2023, two Insureds – CPB and SR – were involved in the same automobile accident. Thereafter, CPB and SR received, or allegedly received, examinations from a physician assistant associated with Atlantic Medical. CPB and SR were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, CPB and SR were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:
>
>> a. On August 1, 2023, three (3) prescriptions were allegedly issued to CPB by Mario Leon, P.A. ("PA Leon") for Fraudulent Topical Lidocaine,

27

Cyclobenzaprine, and Naproxen, which were dispensed and billed for by United Pharmacy; and

b. On August 1, 2023, three (3) prescriptions were allegedly issued to SR by PA Leon for Fraudulent Topical Lidocaine, Cyclobenzaprine, and Naproxen, which were dispensed and billed for by United Pharmacy.

ii. On October 20, 2023, two Insureds – SC and TW – were involved in the same automobile accident. Thereafter, SC and TW received, or allegedly received, examinations from a nurse practitioner associated with South Shore at the Merrick Boulevard Clinic. SC and TW were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, SC and TW were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

a. On February 7, 2024, two (2) prescriptions were allegedly issued to SC by NP Bikel for Cyclobenzaprine and Naproxen-Esomeprazole, which were dispensed and billed for by United Pharmacy; and

b. On February 14, 2024, two (2) prescriptions were allegedly issued to TW by NP Bikel for Cyclobenzaprine and Naproxen-Esomeprazole, which were dispensed and billed for by United Pharmacy.

iii. On February 11, 2024, three Insureds – DW, KW, and SW – were involved in the same automobile accident. Thereafter, DW, KW, and SW received, or allegedly received, examinations from a nurse practitioner associated with South Shore at the Merrick Boulevard Clinic. DW, KW, and SW were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, DW, KW, and SW were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

a. On February 14, 2024, two (2) prescriptions were allegedly issued to DW by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy;

b. On February 14, 2024, two (2) prescriptions were allegedly issued to KW by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

c. On February 14, 2024, two (2) prescriptions were allegedly issued to SW by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

iv. On February 23, 2024, two Insureds – WN and LWP – were involved in the same automobile accident. Thereafter, WN and LWP received, or allegedly

28

received, examinations from a nurse practitioner associated with South Shore at the Merrick Boulevard Clinic. WN and LWP were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, WN and LWP were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

    a. On February 28, 2024, two (2) prescriptions were allegedly issued to WN by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy;

    b. On February 28, 2024, two (2) prescriptions were allegedly issued to LWP by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy;

    c. On April 12, 2024, two (2) prescriptions were allegedly issued to WN by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

    d. On April 12, 2024, two (2) prescriptions were allegedly issued to LWP by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

v. On March 15, 2024, two Insureds – AC and NCC – were involved in the same automobile accident. Thereafter, AC and NCC received, or allegedly received, examinations from nurse practitioners associated with South Shore at the Merrick Boulevard Clinic. AC and NCC were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, AC and NCC were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

    a. On April 10, 2024, two (2) prescriptions were allegedly issued to AC by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy;

    b. On March 27, 2024, two (2) prescriptions were allegedly issued to NCC by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy;

    c. On May 29, 2024, two (2) prescriptions were allegedly issued to AC by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

    d. On June 12, 2024, two (2) prescriptions were allegedly issued to NCC by NP Jean Marie for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

29

vi.  On April 30, 2024, two Insureds – GH and SR – were involved in the same automobile accident. Thereafter, GH and SR received, or allegedly received, examinations from a nurse practitioner associated with South Shore at the Merrick Boulevard Clinic. GH and SR were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, GH and SR were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

   a.  On April 26, 2024, two (2) prescriptions were allegedly issued to GH by NP Jean-Marie for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

   b.  On April 26, 2024, two (2) prescriptions were allegedly issued to SR by NP Jean-Marie for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

vii.  On May 12, 2024, three Insureds – CNG, JM, and JJM – were involved in the same automobile accident. Thereafter, CNG, JM, and JJM received, or allegedly received, examinations from a nurse practitioner associated with South Shore at the Merrick Boulevard Clinic. CNG, JM, and JJM were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, CNG, JM, and JJM were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

   a.  On May 15, 2024, two (2) prescriptions were allegedly issued to CNG by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

   b.  On May 15, 2024, two (2) prescriptions were allegedly issued to JM by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

   c.  On May 15, 2024, two (2) prescriptions were allegedly issued to JJM by NP Bikel for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

viii.  On June 5, 2024, two Insureds –DB and NL – were involved in the same automobile accident. Thereafter, DB and NL received, or allegedly received, examinations from a nurse practitioner associated with South Shore at the Merrick Boulevard Clinic. DB and NL were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, DB and NL were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

30

a. On June 12, 2024, two (2) prescriptions were allegedly issued to DB by NP Jean-Marie for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

b. On June 12, 2024, two (2) prescriptions were allegedly issued to NL by NP Jean-Marie for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

ix. On June 6, 2024, two Insureds – DC and JR – were involved in the same automobile accident. Thereafter, DC and JR received, or allegedly received, examinations from a nurse practitioner associated with South Shore at the Merrick Boulevard Clinic. and JR were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, DC and JR were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by United Pharmacy and other pharmacies. In particular:

a. On June 12, 2024, two (2) prescriptions were allegedly issued to DC by NP Jean-Marie for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy; and

b. On June 12, 2024, two (2) prescriptions were allegedly issued to JR by NP Jean-Marie for Naproxen-Esomeprazole and Cyclobenzaprine, which were dispensed and billed for by United Pharmacy.

104. In keeping with the fact that the prescriptions for the Fraudulent Pharmaceuticals from the Prescribing Providers were medically unnecessary – or the product of forged and unauthorized prescriptions – the Pharmacy Defendants often did not bother to deliver, to the extent delivered at all, the Fraudulent Pharmaceuticals to the Insureds until weeks after the Prescribing Providers issued their purported prescriptions.  For example:

i. Insured DR was allegedly involved in a motor vehicle accident on November 21, 2023. On January 8, 2024, Conrad F. Cean, M.D. ("Dr. Conrad") purportedly issued electronic prescriptions for Naproxen-Esomeprazole and Diclofenac Sodium Gel 3%, dispensed by United Pharmacy, which were delivered to DR on February 16, 2024, thirty-nine days after the prescriptions were ordered.

ii. Insured BC was allegedly involved in a motor vehicle accident on June 18, 2024. On July 3, 2024, NP Bikel issued electronic prescriptions to AC for Esomeprazole-Naproxen and Cyclobenzaprine, dispensed by United Pharmacy, which were delivered to AC on July 17, 2024, fourteen days after the prescriptions were ordered.

iii. Insured MR was allegedly involved in a motor vehicle accident on February 14,

31

2024. On March 20, 2024, PA Nicoloff purportedly issued electronic prescriptions for Fraudulent Topical Lidocaine, Cyclobenzaprine, and Celecoxib, dispensed by United Pharmacy, which were delivered to MR on April 10, 2024, twenty-one days after the prescriptions were ordered.

iv. Insured MA was allegedly involved in a motor vehicle accident on November 11, 2023. On January 2, 2024, NP Zilberman purportedly issued electronic prescriptions for Cyclobenzaprine, Naproxen, and Lidoderm 5% Patches, dispensed by United Pharmacy, which were delivered to MA on January 22, 2024, twenty-days after the prescriptions were ordered.

v. Insured AC was allegedly involved in a motor vehicle accident on June 18, 2024. On July 3, 2024, NP Bikel issued electronic prescriptions to AC for Esomeprazole-Naproxen and Cyclobenzaprine, dispensed by United Pharmacy, which were delivered to AC on July 17, 2024, fourteen days after the prescriptions were ordered.

## C. **The Fraudulent Pharmaceuticals**

105. In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, United Pharmacy routinely billed GEICO for exorbitantly priced pharmaceuticals, overwhelmingly in the form of Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

### i. The Fraudulent Topical Diclofenac and Fraudulent Topical Lidocaine

106. The Pharmacy Defendants solicited the Prescribers and Clinic Controllers to provide them with voluminous prescriptions for Fraudulent Topical Diclofenac (i.e., Diclofenac Sodium 2% Solution and Diclofenac Sodium Gel 3%) because the Pharmacy Defendants could bill for these pharmaceutical products at exorbitant charges, which egregiously inflated the charges submitted to GEICO and other New York No-Fault automobile insurers.

107. United Pharmacy billed GEICO approximately $774,000.00 for dispensing, or purportedly dispensing, Fraudulent Topical Diclofenac to numerous Insureds.

108. United Pharmacy typically billed GEICO $2,358.92 for each prescription of

32

Diclofenac Sodium Gel 3% and $2,686.38 or $2,686.36 for each prescription of Diclofenac Sodium 2% Solution.

109.   The Fraudulent Topical Diclofenac was prescribed pursuant to collusive referral arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

110.   The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

111.   A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

112.   Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

113.   Diclofenac Sodium 2% Solution, which was repeatedly dispensed by United Pharmacy, is only FDA approved for the treatment of knee pain caused by osteoarthritis.

114.   Despite the FDA approved indications for the prescription and use of Diclofenac Sodium 2% Solution, the Prescribers prescribed, and the Defendants dispensed excessive amounts of Diclofenac Sodium 2% Solution to Insureds with no documented medical history of osteoarthritis of the knees.

115. Diclofenac Sodium Gel 3%, which also was repeatedly dispensed by United Pharmacy, is only FDA approved to treat a precancerous skin condition known as actinic keratosis and does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of topical diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

116. Despite the FDA approved indications for the prescription and use of Diclofenac Sodium Gel 3%, the Prescribers prescribed, and the Defendants dispensed excessive amounts of Diclofenac Sodium Gel 3% to Insureds with no documented medical history of the precancerous skin condition known as actinic keratosis.

32. In fact, with respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of topical NSAIDs approved by the FDA such as topical diclofenac 1% have shown they are no more effective than a placebo.

117. Yet, Prescribers prescribed, and the Pharmacy Defendants dispensed, Diclofenac Sodium 2% Solution and Diclofenac Sodium Gel 3% to numerous Insureds, all without regard to genuine patient care.

118. In keeping with the fact that the Fraudulent Topical Diclofenac was prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribers virtually never stated any individualized medical basis for the prescriptions.

119. In further keeping with the Defendants' fraudulent scheme, the Prescribers at times failed to document in their examination reports that the patient was prescribed Fraudulent Topical Diclofenac.

120. In further keeping with the fact that the Fraudulent Topical Diclofenac was

34

prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports prepared by the Prescribers virtually never addressed whether the Fraudulent Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patient experienced any side effects.

121.    The Pharmacy Defendants' egregious billing coupled with the fact that, at times, the Prescribers failed to properly document the prescriptions for Fraudulent Topical Diclofenac, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of these medications to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

122.    Notably, each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur because of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

123.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Ibuprofen and Diclofenac Sodium Gel 3% or Diclofenac Sodium 2% Solution) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

124.    Nevertheless, pursuant to fraudulent treatment protocols designed to maximize profits and the collusive referral agreements among the Pharmacy Defendants, Prescribers, and Clinic Controllers, Prescribers consciously issued multiple prescriptions for multiple Fraudulent

35

Pharmaceuticals and the Pharmacy Defendants consciously dispensed Fraudulent Topical Diclofenac in conjunction with oral NSAIDs to numerous Insureds, thereby engaging in therapeutic duplication, without regard for patient need, and despite the risks it posed to the Insureds' health and well-being. For example:

i.  Insured FJD was involved in a motor vehicle accident on March 20, 2023 and subsequently sought treatment with PA Nicoloff of Home Visits Medical P.C. ("Home Visits"). On July 26, 2023, United Pharmacy dispensed Diclofenac Sodium Gel 3%, Celecoxib, Cyclobenzaprine, Omeprazole, and Fraudulent Topical Lidocaine to FJD pursuant to prescriptions issued by PA Nicoloff on July 17, 2023. There is no evidence that FJD was treated by PA Nicoloff on June 17, 2023. Moreover, the simultaneous prescription of Diclofenac Sodium Gel 3% and Celecoxib constitutes therapeutic duplication.

ii. Insured RT was involved in a motor vehicle accident on July 10, 2023 and subsequently sought treatment with PA Nicoloff of Home Visits. On August 29, 2023 United Pharmacy dispensed Diclofenac Sodium Gel 3%, Celecoxib, Cyclobenzaprine, Fraudulent Topical Lidocaine and Omeprazole to RT pursuant to prescriptions purportedly ordered by PA Nicoloff on August 24, 2023. There is no evidence that RT was treated by PA Nicoloff on August 24, 2023. Moreover, the simultaneous prescription of Diclofenac Sodium Gel 3% and Celecoxib constitutes therapeutic duplication.

iii. Insured NCL was involved in a motor vehicle accident on April 12, 2024, and subsequently sought treatment with PA Arnau of Atlantic Medical. On June 19, 2024, United Pharmacy dispensed Diclofenac Sodium Gel 3%, Celecoxib, Cyclobenzaprine, and Fraudulent Topical Lidocaine, to NCL pursuant to prescriptions issued by PA Arnau on June 17, 2023. The simultaneous prescription of Diclofenac Gel 3% and Celecoxib constitutes therapeutic duplication.

iv. Insured JF was involved in a motor vehicle accident on April 12, 2024, and subsequently sought treatment with PA Arnau of Atlantic Medical. On June 26, 2024, United Pharmacy dispensed Diclofenac Sodium Gel 3%, Celecoxib, Cyclobenzaprine, and Fraudulent Topical Lidocaine to MR pursuant to prescriptions issued by PA Arnau on June 18, 2024. On July 18, 2024, United Pharmacy dispensed Diclofenac Sodium Gel 3%, Celecoxib, Cyclobenzaprine, and Fraudulent Topical Lidocaine to MR pursuant to prescriptions issued by PA Arnau on July 15, 2024. The simultaneous prescription of Diclofenac Gel 3% and Celecoxib constitutes therapeutic duplication.

v.  Insured ER was involved in a motor vehicle accident on March 16, 2024, and subsequently sought treatment with Kenya Crafton N.P. ("NP Crafton") of Atlantic Medical. On May 7, 2024, United Pharmacy dispensed Diclofenac Sodium Gel 3%,

Ibuprofen, Tizanidine, and Fraudulent Topical Lidocaine to ER pursuant to prescriptions issued by NP Crafton on May 2, 2024. The simultaneous prescription of Diclofenac Gel 3% and Ibuprofen constitutes therapeutic duplication.

vi.    Insured KI was involved in a motor vehicle accident on March 29, 2024, and subsequently sought treatment with NP Crafton of Atlantic Medical. On April 18, 2024, United Pharmacy dispensed Diclofenac Sodium Gel 3%, Naproxen, and Tizanidine to KI pursuant to prescriptions issued by NP Crafton on April 14, 2024. The simultaneous prescription of Diclofenac Sodium Gel 3% and Naproxen constitutes therapeutic duplication.

vii.   Insured DM was involved in a motor vehicle accident on December 28, 2023, and subsequently sought treatment with NP Igor Zilberman of Integrative Family Health NP PC ("Integrative Family Health"). On January 19, 2024, United Pharmacy dispensed Diclofenac Sodium 2% Solution, Naproxen, Cyclobenzaprine, and Lidocaine 5% Patches to DM pursuant to prescriptions issued by NP Zilberman on January 9, 2024. The simultaneous prescription of Diclofenac Sodium Solution 2% and Naproxen constitutes therapeutic duplication.

viii.  Insured EG was involved in a motor vehicle accident on October 4, 2023, and subsequently sought treatment with NP Zilberman of Integrative Family Health. On March 7, 2024, United Pharmacy dispensed Diclofenac Sodium Solution 2% and Naproxen-Esomeprazole to EG pursuant to prescriptions issued by NP Zilberman on February 27, 2024. The simultaneous prescription of Diclofenac Sodium Solution 2% and Naproxen-Esomeprazole constitutes therapeutic duplication.

ix.    Insured DR was involved in a motor vehicle accident on November 21, 2023, and subsequently sought treatment with Dr. Cean of Conrad F. Cean MD, PLLC ("Conrad Cean PLLC"). On February 16, 2024, United Pharmacy dispensed Diclofenac Sodium Gel 3% and Naproxen-Esomeprazole to DR pursuant to prescriptions issued by Dr. Cean on January 8, 2024. The simultaneous prescription of Diclofenac Sodium Gel 3% and Naproxen-Esomeprazole constitutes therapeutic duplication.

125.   In addition to the excessive amounts of Fraudulent Topical Diclofenac dispensed by United Pharmacy, in accordance with the fraudulent scheme discussed above, the Pharmacy Defendants routinely billed GEICO – through United Pharmacy – for exorbitantly priced Fraudulent Topical Lidocaine (i.e., Lidocaine 5% Ointment), pursuant to prescriptions solicited from the Prescribers and Clinic Controllers, in exchange for kickbacks or other financial incentives.

126.    United Pharmacy billed GEICO more than $1 million for dispensing, or purportedly dispensing, Fraudulent Topical Lidocaine to numerous Insureds.

127.    United Pharmacy typically billed GEICO between $1,218.97 and $1,904.65 for each prescription of Fraudulent Topical Lidocaine.

128.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

129.    Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

130.    Excessive dosage or short intervals between doses of topical lidocaine can cause serious adverse effects, including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypertension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

131.    The NYS WCB's published guidelines stressed the risks of adverse side effects associated with topical pain medications such as lidocaine, by specifically stating that "topical agent[s] should be prescribed with strict instructions for application and maximum number of applications per day to obtain the desired benefit and avoid potential toxicity." See NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 38); NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 34).

132.    Despite this, the Prescribers never recommended Insureds first use OTC Lidocaine products to treat minor aches and pain which they sustained in fender-bender type motor vehicles

accidents. Notably, Lidocaine ointments with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% Ointment at a fraction of the cost.

133.    For example, the Prescribers never recommended Insureds first try Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices generally around $10.00 or $20.00.

134.    As with the prescriptions for the Fraudulent Topical Diclofenac, the initial examination reports prepared by the Prescribers virtually never set forth any individualized medical basis for the Fraudulent Topical Lidocaine prescriptions.

135.    In further keeping with the Defendants' fraudulent scheme, the Prescribers at times failed to document in their examination reports that the patient was prescribed Fraudulent Topical Lidocaine.

136.    Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Topical Lidocaine prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

137.    Nevertheless, the Prescribers routinely prescribed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, and multiple other Fraudulent Pharmaceuticals, on the same date to a single patient, without regard to medical necessity.

### ii.    The Fraudulent Naproxen-Esomeprazole

138.    The Pharmacy Defendants also solicited the Prescribers and Clinic Controllers to provide United Pharmacy with voluminous prescriptions for Fraudulent Naproxen-Esomeprazole – again because the Pharmacy Defendants could readily buy these products but bill GEICO and

39

other New York No-Fault insurers for huge sums based on egregiously high wholesale prices.

139.    To date, the Pharmacy Defendants have submitted more than $1.27 million in claims to GEICO through United Pharmacy seeking reimbursement for the Fraudulent Naproxen-Esomeprazole, which United Pharmacy dispensed and billed at $2,680.78 for each prescription – without regard for medical necessity or genuine patient care.

140.    The Fraudulent Naproxen-Esomeprazole were clinically inappropriate and medically unnecessary.

141.    Naproxen-Esomeprazole is a multi-ingredient oral medication containing naproxen, a nonsteroidal anti-inflammatory drug, and esomeprazole, a proton-pump inhibitor ("PPI"). The naproxen is intended to relieve pain and inflammation, while esomeprazole is intended to decrease the risk of developing stomach ulcers.

142.    Naproxen-Esomeprazole is only FDA approved to treat symptoms relating to osteoarthritis, rheumatoid arthritis and ankylosing spondylitis in patients, and to decrease the risk of developing NSAID-related gastric ulcers. However, the FDA indicates that Naproxen-Esomeprazole should not be used as the first course of treatment for acute pain.

143.    Additionally, proton-pump inhibitors such as omeprazole and esomeprazole are only appropriate when the patient presents with certain risk factors indicative of a need to prevent NSAID-related ulcers (e.g., history of ulcers or gastroesophageal reflux disease). The Prescribers' examination reports failed to document any such risk factors.

144.    Moreover, the American College of Gastroenterology has published guidelines that indicate certain risk factors that puts patients at an increased risk of NSAID-related gastrointestinal injuries, thereby necessitating a PPI like esomeprazole. For example, a patient's prior medical history of complicated ulcers or patients over the age of 65 years old are at increased risk for

NSAID-related injury.

145.    Despite the FDA approved indications for the prescription and use of Naproxen-Esomeprazole, and widely accepted guidelines relating to the medical necessity of PPIs, the Prescribers prescribed, and the Defendants dispensed excessive amount of Fraudulent Naproxen-Esomeprazole – a combined NSAID and PPI medication – to Insureds with no documented history of arthritis related conditions and/or factors which put patients at moderate to high risk of NSAID-associated gastric ulcers.

146.    Moreover, the Prescribers routinely prescribed the exorbitantly priced Fraudulent Naproxen-Esomeprazole to Insureds despite the fact that most Insureds were only involved in minor fender-bender type motor vehicle accidents and there are no medical studies supporting the efficacy of these products in treating musculoskeletal pain experienced as a result of a motor vehicle accident.

147.    Notably, each of the ingredients contained in Fraudulent Naproxen-Esomeprazole are available over-the counter without a prescription at a fraction of the cost.

148.    To the extent the initial examination reports prepared by the Prescribers set forth the medical basis for the Naproxen-Esomeprazole prescriptions, it was non-individualized and perfunctory.

149.    Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Naproxen-Esomeprazole prescribed provided any relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

150.    In fact, the examination reports prepared by the Prescribers often indicated Tylenol and Ibuprofen were effective in alleviating the patients' pain symptoms. Nevertheless, the

Prescribers prescribed, and United Pharmacy dispensed, the Fraudulent Naproxen-Esomeprazole as part of the scheme to inflate the charges to GEICO and other New York automobile insurers.

**D.    The Exploiting of Patients for Financial Gain Through the Unlawful, Collusive Referral Arrangements**

151.    As noted above, New York Public Health Law §238-a prohibits the Prescribers from making a referral for pharmacy services to a pharmacy or any other purveyor of pharmacy services where the practitioner (or immediate family member of the practitioner) has a financial relationship with the pharmacy or the purveyor of pharmacy services, which financial arrangement includes any renumeration, directly or indirectly, overtly or covertly, in cash or in kind.

152.    New York's statutory framework also provides, among other things, that pharmacies and licensed healthcare professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

153.    Here, to gain access to Insureds so that the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Pharmacy Defendants could obtain from GEICO and other New York automobile insurers, the Pharmacy Defendants entered into collusive, financial agreements with the Prescribers and Clinic Controllers in order to direct prescriptions to United Pharmacy that were illegitimate and for medically unnecessary Fraudulent Pharmaceuticals, which egregiously inflated the charges submitted to GEICO.

154.    The Prescribers had no legitimate medical reason to prescribe, and United Pharmacy had no legitimate reason to dispense, the Fraudulent Pharmaceuticals in large quantities

42

to the Insureds.

155. The Prescribers nevertheless prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to Insureds treating at the No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that the Fraudulent Pharmaceuticals were not medically necessary; were often being prescribed without regard to pharmacologic outcomes; were often being prescribed with gross indifference to patient health, care and safety; were prescribed as a matter of course without any recommendation that patients first try OTC products; and were prescribed without attention to cost and fiscal responsibility, particularly given that there are FDA-approved drugs available and appropriate for the patients at significantly less cost.

156. To ensure that the prescriptions for the Fraudulent Pharmaceuticals were directed to United Pharmacy, the Pharmacy Defendants, Prescribers, and Clinic Controllers virtually never gave the Insureds the option of identifying a pharmacy of their choosing.  In keeping with the fact that the Prescribers and Clinic Controllers deprived the Insureds of identifying a pharmacy of their choosing, the prescriptions for the Fraudulent Pharmaceuticals were directed to United Pharmacy notwithstanding that: (i) in many instances, the No-Fault Clinics and/or the Insureds themselves were located in counties far from United Pharmacy and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and/or the Insureds.

157. The Prescribers and Clinic Controllers had no legitimate reason to issue medically unnecessary prescriptions to the Insureds for the Fraudulent Pharmaceuticals, and steer those prescriptions to United Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients, unless the Prescribers and Clinic Controllers profited from their participation through the payments of

43

kickbacks or other financial incentives by the Pharmacy Defendants.

158.    Upon information and belief, the Prescribers were compensated either directly by the Pharmacy Defendants or through some other economic "in kind" arrangement effectuated through the Clinic Controllers, such as a quid-pro-quo arrangement that gave the Prescribers the ability to treat the Insureds at the No-Fault Clinics and separately bill GEICO.

159.    But for the payments of kickbacks or other financial quid-pro-quo arrangements established in connection with the treatment of Insureds at the No-Fault Clinics, the Prescribers would not have prescribed the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole, or the volume of other Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions to United Pharmacy.

160.    The Pharmacy Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid as compensation for steering the prescriptions to United Pharmacy since such compensations arrangements are in violation of New York law.

161.    Nevertheless, based on the circumstances surrounding the unlawful, collusive, arrangements, the Pharmacy Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by United Pharmacy in furtherance of the fraudulent scheme.

**IV.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

162.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

44

163.    Each NDC (and, thus, the AWP) for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

164.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

165.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

166.    The Pharmacy Defendants intentionally targeted the Fraudulent Pharmaceuticals, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through United Pharmacy and to maximize their profits.

167.    In support of its charges, United Pharmacy typically submitted: (i) an NF-3 Form which included the purported NDC numbers, units, and corresponding charges for each drug product; (ii) a copy of the Prescribers' prescriptions; (iii) an itemized pharmacy form, which includes the patient's name, the prescribed pharmaceutical, the purported NDC numbers and corresponding charges for each drug product, and the prescribing provider; (iv) a delivery receipt or delivery tracking form; and (v) an assignment of benefit form assigning the Insureds' benefits to the Pharmacy Defendants.

168.    The NDC numbers listed on the NF-3 Forms submitted by the Pharmacy Defendants through United Pharmacy are what identified the purported AWPs for each of the

45

Fraudulent Pharmaceuticals.

169. The Pharmacy Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Pharmaceuticals that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals.

170. The Pharmacy Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Pharmaceuticals that the Pharmacy Defendants targeted to use in connection with the billing submitted through United Pharmacy, but nevertheless billed GEICO and other New York No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

## V.  The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

171. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have been submitted to GEICO by and on behalf of United Pharmacy seeking payment for the pharmaceuticals for which United Pharmacy is ineligible to receive payment.

172. These forms, including NF-3 forms and other supporting records that the Pharmacy Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

> i. The NF-3 forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to a fraudulent insurance scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols and collusive referral arrangements;
>
> ii. The NF-3 forms and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were legitimately billing for dispensing

46

medically necessary pharmaceuticals independently selected by various prescribing practitioners. In fact, the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) and steered prescriptions for these products to United Pharmacy so it could dispense these products in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO;

iii. The NF-3 forms and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were legitimately filling prescriptions for medically necessary pharmaceuticals independently selected by various prescribing practitioners. In fact, the Pharmacy Defendants participated in unlawful, collusive referral arrangements in which the Pharmacy Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy pursuant to in exchange for unlawful kickbacks and other financial incentives; and

iv. The NF-3 forms and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were legitimately filling prescriptions for medically necessary pharmaceuticals independently selected by various prescribing practitioners. In fact, the Pharmacy Defendants dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and unauthorized prescriptions that were based on decisions by laypersons.

173.    As a direct result of Defendants' scheme, and in reliance on the fraudulent billing submissions made by United Pharmacy, GEICO was led to voluntarily issue payments to the Pharmacy Defendants totaling approximately $2.3 million.

## VI.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

174.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for those products.

175.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

176.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Pharmacy Defendants intentionally targeted expensive

47

prescription drug products which they systematically dispensed to individuals involved in automobile accidents who had no medical need for the pharmaceuticals prescribed; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (iii) the Pharmacy Defendants were involved in collusive referral arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies.

177.    The billing and supporting documentation submitted by the Pharmacy Defendants to GEICO for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

178.    The Pharmacy Defendants have retained, among others, the Bangiyev Firm to pursue collection from GEICO and other insurers of the fraudulent charges submitted through United Pharmacy, typically through numerous individual, expensive, and time-consuming collection proceedings, as part of the scheme and to monetize the Defendants' fraudulent activity as quickly as possible. In fact, the Pharmacy Defendants continue to have legal counsel pursue collection proceedings against GEICO and other insurers without regard for the fact that United Pharmacy has been engaged in fraud.

179.    The Pharmacy Defendants' collection efforts through separate No-Fault collection proceedings, which may continue for years, is an essential part of their fraudulent scheme since the Pharmacy Defendants know it is impractical for a No-Fault arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

48

180.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $2.3 million representing payments made by GEICO based upon the fraudulent charges submitted by the Pharmacy Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $6.6 million.

181.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
### Against Alishayeva and United Pharmacy
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

182.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

183.    There is an actual case in controversy between GEICO and the Pharmacy Defendants (*i.e.*, Alishayeva and United Pharmacy) regarding approximately $1.4 million in pending fraudulent billing for the Fraudulent Pharmaceuticals that the Pharmacy Defendants submitted or caused to be submitted to GEICO through United Pharmacy.

184.    United Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because United Pharmacy billed for pharmaceutical products that were medically unnecessary and/or prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive referral arrangements designed to exploit the patients for financial gain, without regard for genuine patient care.

185.    United Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that United Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO.

186.    United Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants participated in unlawful, collusive referral arrangements in violation of, among other things, N.Y. Pub. Health Law §238-a, in which they steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy in exchange for kickbacks or other financial incentives..

187.    United Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by United Pharmacy pursuant to illegal, invalid, and unauthorized prescriptions issued as a result of decisions made by laypersons.

188.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through United Pharmacy.

## THE SECOND CLAIM FOR RELIEF
### Against Alishayeva, United Pharmacy, and the John Doe Defendants
### (Common Law Fraud)

189.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

190.    United Pharmacy, Alishayeva, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of United Pharmacy.

191.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceutical products were medically necessary when in fact the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols and collusive referral arrangements designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that United Pharmacy was properly and legitimately billing for dispensing medically necessary pharmaceuticals independently selected by various prescribing practitioners when in fact the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that were dispensed in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; (iii) in every claim, the representation that United Pharmacy was legitimately filling prescriptions for medically necessary pharmaceuticals independently selected by various prescribing practitioners when in fact the Pharmacy Defendants participated in unlawful, collusive referral arrangements in which they steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal

51

prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy in exchange for kickbacks or other financial incentives; and (iv) in every claim, the representation that United Pharmacy was legitimately filling prescriptions for medically necessary pharmaceuticals independently selected by various prescribing practitioners when in fact the Pharmacy Defendants dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and unauthorized prescriptions issued as a result of decisions made by laypersons.

192.    United Pharmacy, Alishayeva, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through United Pharmacy that were not compensable under the No-Fault Laws.

193.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $2.3 million pursuant to the fraudulent bills submitted by the Defendants through United Pharmacy.

194.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

195.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against Alishayeva, United Pharmacy, and the John Doe Defendants**
**(Unjust Enrichment)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above

197.    As set forth above, the Pharmacy Defendants and the John Doe Defendants have

52

engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

198.    When GEICO paid the bills and charges submitted by or on behalf of United Pharmacy for No-Fault Benefits, it reasonably believed that it was obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

199.    The Pharmacy Defendants and John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Pharmacy Defendants and John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

200.    The Pharmacy Defendants' and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

201.    By reason of the above, these Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $2.3 million.

### THE FOURTH CLAIM FOR RELIEF
**Against Alishayeva**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

202.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

203.    United Pharmacy is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

204.    Alishayeva knowingly conducted and/or participated, directly or indirectly, in the conduct of United Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of

53

fraudulent charges on a continuous basis – and to continue efforts to collect on those charges through the present – seeking payments that United Pharmacy was not entitled to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols and collusive referral arrangements designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that were dispensed in place of other effective, less costly pharmaceuticals in order to inflate the billing; (iii) the Pharmacy Defendants participated in unlawful, collusive referral arrangements in which they steered the Prescribers and Clinic Controllers to direct unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy in exchange for kickbacks or other financial incentives; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, and unauthorized prescriptions issued as a result of decisions made by laypersons. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

205.    United Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud and wire fraud are the regular way in which Alishayeva operated United Pharmacy, inasmuch as United Pharmacy never was entitled to bill for or collect No-Fault Benefits and acts of mail fraud and/or wire fraud therefore were essential in order for United Pharmacy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that the Pharmacy Defendants

54

continue to submit, or cause to be submitted, fraudulent claims to GEICO, and continue to attempt collection on the fraudulent billing submitted through United Pharmacy to the present day.

206. United Pharmacy is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system, engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals, and bill pursuant to predetermined fraudulent protocols to inflate the charges and financially enrich the Pharmacy Defendants. These inherently unlawful acts are taken by United Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

207. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $2.3 million pursuant to the fraudulent bills submitted by Alishayeva through United Pharmacy.

208. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE FIFTH CLAIM FOR RELIEF**
**Against Alishayeva and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

209. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

210. United Pharmacy is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

211. Alishayeva and the John Doe Defendants are employed by or associated with the United Pharmacy enterprise.

212. Alishayeva and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of United Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years that United Pharmacy was not entitled to receive under the New York No-Fault insurance laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols and collusive referral arrangements designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products and Fraudulent Naproxen-Esomeprazole) that were dispensed in place of other effective, less costly pharmaceuticals in order to inflate the charges; (iii) the Pharmacy Defendants participated in unlawful, collusive referral arrangements in which they steered the Prescribers and Clinic Controllers to direct unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy in exchange for kickbacks or other financial incentives; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, and unauthorized prescriptions issued as a result of decisions made by laypersons. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

213. Alishayeva and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

56

214. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $2.3 million pursuant to the fraudulent bills submitted by the Defendants through United Pharmacy.

215. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE SIXTH CLAIM FOR RELIEF**
**Against the Prescribing Provider Defendants and John Doe Defendants**
**(Aiding and Abetting Fraud)**

216. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

217. The Prescribing Provider Defendants (*i.e.*, NP Jean-Marie and NP Bikel) and John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Alishayeva and United Pharmacy.

218. The acts of the Prescribing Provider Defendants in furtherance of the fraudulent scheme include: (i) knowingly purporting to prescribe the Fraudulent Pharmaceuticals in predetermined, protocol fashion; (ii) participating in illegal, collusive arrangements with Alishayeva and United Pharmacy to prescribe and direct illegal, predetermined prescriptions for the Fraudulent Pharmaceuticals to United Pharmacy; and (iii) permitting their names to be used in the billing, prescription records and treatment reports submitted in support of the Fraudulent Pharmaceuticals that were used solely to maximize profits without regard for genuine patient care.

219. The conduct of the Prescribing Provider Defendants in furtherance of the fraudulent scheme was significant and material, with more than half of the fraudulent billing submitted to GEICO by United Pharmacy being attributable to prescriptions issued by the Prescribing Provider

Defendants. Further, the Prescribing Provider Defendants' conduct was necessary and critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for United Pharmacy submit billing for the Fraudulent Pharmaceuticals and to obtain the large payments from GEICO and other insurers.

220.    The acts of John Doe Defendants in furtherance of the fraudulent scheme include participating in the operation and control of United Pharmacy and knowingly participating in the implementation and facilitation of the predetermined protocols and the illegal, collusive referral arrangements with the Prescribing Provider Defendants and the other Prescribers. The conduct of John Doe Defendants in furtherance of the fraudulent scheme was significant and material, as the fraudulent scheme is complex, involved multiple prescribers, working at multiple No-Fault Clinics issuing prescriptions, or purported prescriptions, to numerous Insureds for multiple targeted pharmaceuticals, along with millions of dollars of billing and collection related activity.

221.    The Prescribing Provider Defendants and John Doe Defendants undertook the above wrongful acts and conduct knowing that Alishayeva and United Pharmacy were engaged in a scheme to defraud GEICO and other New York automobile insurance companies that involved (i) prescribing and dispensing Fraudulent Pharmaceuticals that were not medically necessary and were prescribed and dispensed without regard for genuine patient care; (ii) submitting billing from United Pharmacy to GEICO and other New York automobile insurance companies that was inflated as a result of pre-determined, protocol prescriptions for expensive Fraudulent Pharmaceuticals that were designed solely to maximize profits; (iii) intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Alishayeva and United Pharmacy could bill for at exorbitant prices despite the availability of over-the-counter and other effective, less costly pharmaceuticals that could have been prescribed and dispensed to

58

the patients; and (iv) engaging in collusive referral arrangements involving the steering of prescriptions and the payment of kickbacks and other financial incentives to generate large volumes of predetermined prescriptions for the Fraudulent Pharmaceuticals that could be directed to United Pharmacy.

222.    The Prescribing Provider Defendants and John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to United Pharmacy for medically unnecessary and illusory Fraudulent Pharmaceuticals that were not compensable under the No-Fault Laws.

223.    The conduct of the Prescribing Provider Defendants and John Doe Defendants caused GEICO to pay approximately $2.3 million pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through United Pharmacy.

224.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

225.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages from the Prescribing Provider Defendants and John Doe Defendants in an amount to be determined at trial, but in the approximate amount of $2.3 million, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

**THE SEVENTH CLAIM FOR RELIEF**
**Against United Pharmacy and the Prescribing Provider Defendants**
**(New York Public Health Law § 238-A)**

226.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

227.    Section 238-a of the New York Public Health Law provides, in relevant part:

1.    (a) A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging

services may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such healthcare provider.

(b) A heath care provider or a referring practitioner may not present or cause to be presented to any individual or third party payer, or other entity, a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.

228. Pursuant to Section 238-a (7), "[i]f a referring practitioner or a health care provider furnishing clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services or any other person or entity, collects any amounts that were billed in violation of this section, such referring practitioner and health care provider and other person or entity shall be jointly and severally liable to the payer for any amounts so collected."

229. Pursuant to Section 238(6) of the New York Public Health Law, a "financial relationship" includes an ownership interest, investment interest, or compensation arrangement. For purposes of Section 238-a, a compensation arrangement means "any arrangement involving renumeration between a practitioner, or immediate family member, and a healthcare provider" and "includes any renumeration, directly or indirectly, overtly or covertly, in cash or in kind." See §238-a(5)(a).

230. Defendant United Pharmacy is a "health care provider" as that term is defined under Section 238(6) of the New York Public Health Law.

231. The Prescribing Provider Defendants – NP Jean-Marie and NP Bikel – and the other Prescribers are practitioners as that term is defined under Section 238(11) of the New York Public

Health Law.

232.    United Pharmacy regularly steered prescriptions from the Prescribing Provider Defendants and other Prescribers to the pharmacy, and the Prescribing Provider Defendants and other Prescribers regularly made referrals in the form of transmitting prescriptions for Fraudulent Pharmaceuticals to United Pharmacy, with whom they had collusive, referral and financial arrangements.

233.    United Pharmacy and the Prescribing Provider Defendants, as well as the other Prescribers, had a "financial relationship" as that term is defined under Section 238(3) of the New York Public Health Law and routine referrals were made to United Pharmacy by the Prescribing Provider Defendants and other Prescribers for pharmacy services; specifically the dispensing of the Fraudulent Pharmaceuticals.

234.    The referrals by the Prescribing Provider Defendants and other Prescribers to United Pharmacy violate Section 238-a of the New York Public Health Law.

235.    Further, in violation of Section 238-a(1)(b) of the New York Public Health Law, United Pharmacy has submitted, or caused to be submitted, to GEICO claims for payment for pharmacy services furnished pursuant to a prohibited referral.

236.    GEICO has paid approximately $2.3 million to United Pharmacy pursuant to the fraudulent bills for pharmacy services that the United Pharmacy submitted or caused to be submitted to GEICO in violation of Section 238-a of the Public Health Law. Pursuant to Section 238-a(7) of the Public Health Law, GEICO is entitled to recover such amounts from United Pharmacy and the Prescribing Provider Defendants who, as a health care provider and practitioners, are jointly and severally liable to GEICO for the amounts collected by United Pharmacy.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against Alishayeva and United Pharmacy, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that United Pharmacy has no right to receive payment for any pending bills, amounting to approximately $1.4 million submitted to GEICO;

B.      On the Second Claim for Relief against Alishayeva, United Pharmacy, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $2.3 million together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim for Relief against Alishayeva, United Pharmacy, and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $2.3 million together with such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim For Relief against Alishayeva, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $2.3 million together with treble damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Claim For Relief against Alishayeva and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $2.3 million together with treble damages, costs, interest and such other and further

62

relief as this Court deems just and proper.

F.    On the Sixth Claim For Relief against NP Jean-Marie and NP Bikel and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $2.3 million together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

G.    On the Seventh Claim For Relief against United Pharmacy and NP Jean-Marie and NP Bikel, compensatory damages, jointly and severally, in favor of GEICO in an amount to be determined at trial but approximately $2.3 million and such other and further relief as this Court deems just and proper.

Dated:  Uniondale, New York
        November 26, 2025

RIVKIN RADLER LLP


By:   /s/ *Michael A. Sirignano*
      Michael A. Sirignano
      Barry I. Levy
      Joshua D. Smith
      Joanna Rosenblatt
      926 RXR Plaza
      Uniondale, New York 11556
      (516) 357-3000

      *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

63